SAMUEL BRONSTON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bronston v. Commissioner
Docket No. 6051-69.
United States Tax Court
T.C. Memo 1975-5; 1975 Tax Ct. Memo LEXIS 367; 34 T.C.M. (CCH) 27; T.C.M. (RIA) 750005; January 13, 1975, Filed. *367 B deducted certain expenditures made in 1964 which he alleged were made on behalf of wholly-owned corporation X to protect his own trade or business of being an independent motion picture producer. B was also employed by X corporation, which in turn entered into limited partnership agreements to produce and exploit motion pictures. Held: B was not in the trade or business of being an independent motion picture producer. In 1964, B received $78,000 from X and Y corporations (both wholly-owned by B) which he reported as salary income. Respondent reclassified $58,000 of this amount as corporate distributions from X and Y corporations. Held: B received corporate distributions in the amount of $58,000 from X and Y corporations. Julius November, for the petitioner. Walter C. Welsh and Stanley J. Goldberg, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined a deficiency in petitioner's income tax for taxable year 1964 in the amount of $198,667.75. Some of the issues have been settled by the parties. The issues remaining for decision are: (1) Whether petitioner is entitled to deductions for certain expenditures made in 1964 as ordinary and necessary business expenses; and, alternatively, if found to be ordinary and necessary business expenses, whether such amounts should be disallowed because they are allocable or chargeable against amounts excludable from gross income under section 911(a); [1]
(2) Whether amounts paid to petitioner by two corporations in which he was employed constituted, in part, corporate distributions rather than salary payments. *369 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Samuel Bronston (hereinafter referred to as petitioner) was a legal resident of Spain when the petition was filed. He filed his Federal income tax return for the taxable year 1964 with the director of internal operations of the internal revenue service in Washington, D.C.
Petitioner was the sole shareholder of Samuel Bronston Productions, Inc. (hereinafter referred to as SBPI), which was formed on or about February 11, 1959. SBPI maintained its main office in New York, New York. Petitioner had been in the business of motion pictures for 40 years, 30 years of which were as a producer. On December 16, 1959, petitioner and Pierre S. duPont, III (hereinafter referred to as duPont) entered into an agreement whereby, pursuant to the laws of the State of New York, they entered into a limited partnership to be conducted under the name of Nazareth Production Company (hereinafter referred to as Nazareth Company). The stated purpose of the partnership was to participate jointly with SBPI in the production of a film, the final title of which was "King of Kings." Petitioner was the general partner *370 of the Nazareth Company partnership for which he was to receive no salary or other compensation, but he was to be reimbursed for any direct expenses incurred in connection with the conduct of its business. The entire management of the business of Nazareth Company rested in the general partner, who was required to devote such time to the partnership business as was necessary. The agreement also provided that the general partner could become a salaried employee of any entity chosen to perform and supervise the technical and administrative phases of the production of the motion pictures. On April 12, 1962, the agreement was amended to provide for the addition of James F. Covington, Jr., as a limited partner and to authorize the Nazareth Company to expand the scope of the partnership business to include financing other motion pictures including specifically one entitled "El Cid." The limited partners contributed cash to the partnership and were not to be held personally liable for losses of the partnership except to the extent of their contributions paid or unpaid. The agreement was to terminate five years from the date of its commencement or upon the death, disability, adjudication *371 of incompetence or insanity of the general partner, whichever occurred first. On June 27, 1961, petitioner signed an employment agreement with Bronston Distributions, Inc. (hereinafter referred to as BDI), wherein he was to be engaged as president of that corporation. Petitioner's duties as president were to supervise and direct all operations of BDI. The agreement required petitioner to devote as much of his time, attention and energies to the business of BDI as it may direct but he was not required to devote his entire time, attention and energy to its business. Petitioner was authorized to incur reasonable expenses for promotion of the business of BDI and was to be advanced or reimbursed for such expenses. The name of the corporation was ultimately changed from BDI to El Cid Distributions, Inc. (hereinafter referred to as ECDI). The term of the agreement was to run from July 1, 1961 through June 30, 1963. Petitioner's basic salary under the agreement was to be $39,000 plus additional compensation of $39,000 for each year, to be paid in years succeeding termination of the agreement. On or about December 28, 1962, SBPI acquired 100 percent of the stock of ECDI. SBPI, *372 duPont, and Jesse Moss, Trustee [2] (hereinafter referred to as Moss), entered into various limited partnership agreements for the purpose of producing and exploiting certain motion pictures. The limited partnerships, and the specific motion pictures for which they were organized are as follows: Date of Agreement
Name of Firm
Specific Motion Picture
6/6/62
Bronston-Prado Productions
"55 Days at Peking"
8/31/62
Bronston-Roma Productions
"The Fall of the Roman Empire"
9/7/62
Bronston-Midway Productions
"The Circus Story" later changed to "Circus World"
12/11/62
Bronston-Paris Productions
"Paris-1900"
12/11/62
Bronston-France Productions
"The French Revolution"
Each agreement [3] stated that the purpose of the partnership was to produce and exploit motion pictures including, but not limited to, the motion pictures specifically listed therein. SBPI was the general partner and duPont and Moss were the limited partners in each of the partnerships. The agreements *373 provided that the general partner was not to receive compensation for any services rendered as general partner but that it was to be reimbursed for any direct expenses (other than compensation to petitioner) incurred in the conduct of the business of the partnership provided said expenses were reasonable. Neither petitioner nor SBPI were required to put up capital for any of these partnership ventures. Moss and duPont were required by the agreements to put up the capital for the motion picture productions. The agreements were signed either by petitioner as president of SBPI or Leon Patlach as vice president and treasurer of SBPI. The various motion pictures with which petitioner was involved were produced and exploited through the various limited partnership organizations because of the need to keep separate accounting for each motion picture as the mix of people (director, actors or investors) was different for each motion picture. SBPI was always the general partner in the joint ventures. The entire management of the business *374 of four of the limited partnerships [4] was to be the responsibility of the general partner, who was to devote to the partnership business such time as necessary. The agreements also provided that the general partner and the limited partners of four of the limited partnerships could engage in other motion picture productions and related activities either alone or in conjunction with others. Furthermore, each of these four agreements provided that the general partner may be engaged by the partnership in any and all capacities to assist in the production of any motion pictures undertaken by the various limited partnerships and that it was understood that petitioner may be engaged by the partnership in the capacity of individual producer for the picture and that such employment shall not constitute the seizure of a partnership opportunity. *375 On June 27, 1963, petitioner entered into an employment agreement with SBPI in which petitioner was engaged as president to supervise and direct all of its operations. The employment agreement was to run from July 1, 1963 through December 31, 1964. The agreement also provided that petitioner was to be reimbursed for "all of his out-of-pocket expenditures which arise out of, or are a result of, or are made on behalf of or in connection with the business of the Employer." Petitioner was to receive compensation under this agreement as follows: Period
Compensation
7/1/63 - 12/31/63
$10,000
1/1/64 - 12/31/64
20,000
The agreement also required SBPI to furnish petitioner a private office, stenographic help and such other facilities and services suitable to his position and adequate for the performance of his duties. Petitioner was required to devote as much time to the business of SBPI as the latter reasonably directed. Petitioner was free to engage in any other business activities, provided such activities were not incompatible with his duties under the employment agreement. In late 1963 or early 1964, petitioner and duPont had a disagreement after which *376 duPont notified Moss (as trustee) that he would not be responsible for any further obligations or contracts of petitioner unless they had his specific signature. On February 21, 1964, the partnership agreements for Bronston-Prado Productions, Bronston-Roma Productions, Bronston-Midway Productions, and Bronston-France Productions were amended to provide that Moss, as trustee, should have all the powers and duties of the general partner (SBPI) for the purpose of preserving the partnership assets, winding-up the partnership affairs, and liquidating the partnership. It was also provided that "Moss' obligation and duties as trustee as aforesaid shall be paramount to any obligation or duty he may have because of his past or present relationship with any of the parties hereto." On February 25, 1964, a certificate amending the limited partnership of Bronston-Paris Productions was filed which granted these powers to Moss in that organization. On June 5, 1964, Chapter XI Bankruptcy proceedings were initiated on behalf of SBPI in New York, New York. At the time of the Chapter XI Bankruptcy proceedings in the United States, certain corporations in which the petitioner and duPont were shareholders *377 were also in bankruptcy type proceedings in Spain. These proceedings were entitled "Suspencion des Pagos" (hereinafter suspension proceedings) and commenced in 1964 and terminated in 1967. The surviving entity in the Chapter XI proceeding was called Principal Creditors Films (hereinafter referred to as PCF) in whose custody all agreements and film negatives were entrusted. The disagreement between petitioner and duPont resulted in the cancellation of six films then in production. In 1965 duPont engaged Mr. Michael Stern (hereinafter referred to as Stern) to examine the business dealings that duPont had with petitioner and inform him whether or not they were legitimate business deals. During this investigation Stern investigated the suspension of payments proceedings in Spain. After petitioner's financial difficulty started in Spain, the Spanish Government gave him permission to import shipments of oil into Spain. The purpose of the permission for importation of oil at this time was to allow petitioner to satisfy his creditors under the suspension proceedings. Attorney Louis Nizer was retained to act as a mediator to find a solution to problems between petitioner and *378 duPont for which services petitioner paid $75,000. Saul Rosenblatt, also an attorney, was retained to assist Spanish attorneys in the suspension proceedings. Petitioner also paid $10,000 to the law firm of Weil, Gothshal & Manges, which was retained in New York to file the Chapter XI Bankruptcy proceedings. The Samuel Bronston studio located in Spain was owned and operated by a corporation entitled ICESA which was wholly-owned by Samuel Bronston Espanola, a Spanish corporation, the shareholders of the latter being, among others, petitioner and duPont. ICESA was not involved in the suspension proceedings in Spain. Petitioner produced no motion pictures after late 1964 or 1965. On his 1964 income tax return, petitioner reported salary income as follows: Payor
Contract Date
Period Earned
Total
ECDE
6/27/61
7/1/61 to 6/30/62
$ 39,000.00
SBPI
6/27/61
7/1/61 to 6/30/62
39,000.00
6/27/63
7/1/63 to 12/31/63
10,000.00
1/1/64 to 2/29/64
1,666.67
89,666.67
Less:
Salaries earned outside U.S.A.
(51,500.00)
Exclusion under Revenue Act for 1962
(10,434.39)
Taxable salaries
27,732.28
Petitioner *379 also reported as gain or loss from business or profession (schedule C) the income as follows: Payor
Contract Date
Period Earned
Total
Samuel Bronston Productions, Inc., re: The Fall of the Roman Empire
6/27/61
1/1/62 to 12/31/62
$ 50,000.00
Circus World
8/27/62
(8/1/62 to 12/31/62
25,000.00
(1/1/63 to 12/31/63
25,000.00
Nightrunners of Bengal
7/13/63
(7/1/63 to 12/31/63
50,000.00
(1/1/64 to 2/29/64
8,333.33
158,333.33
Less: Earned Outside U.S.A., Pre 1963
(33,288.00)
Exclusion under Revenue Act for 1962
(24,565.61)
Taxable producers' fees
100,479.72
Sale of Commodities
2,064,299.20
Total, Item 1, Schedule C
$2,164,778.92
From this amount, petitioner deducted "other business expenses" as follows: Motion Picture Studio Maintenance
$132,806.53
Production Costs Re: Motion Pictures
16,000.00
Travel
16,517.70
Telephone and Telegraph
16,160.82
Postage, Stationery & Office Supplies
353.05
Miscellaneous
272.96
Professional Fees, Commissions and Other Fees
153,010.08
Rent
3,495.15
Total
$338,616.29
In the statutory notice of deficiency *380 dated September 10, 1969, respondent treated $20,000 (of the $78,000 petitioner reported as salary) and treated the remaining $58,000 as a corporate distribution. With regard to the "other business expenses" claimed by petitioner, respondent allowed $38,888.24 as a deduction and disallowed $299,728.05. In this connection, respondent disallowed in total the amounts deducted for motion picture studio maintenance, travel, telephone and telegraph, postage, stationery and office supplies, miscellaneous, and rent. The respondent allocated $4,284 of the amount claimed as professional fees, commissions and other fees to "Production Costs Re: Motion Pictures." This adjustment increased the amount claimed for production costs from $16,000 to $20,284, and this entire amount was disallowed by respondent. Correspondingly, the amount claimed for professional fees, commissions and other fees was reduced to $148,816.08 and the amount of professional fees allowed was reduced to $37,607.64. The net amount of professional fees and other fees disallowed was $111,118.44. Respondent stated that the deductions listed had been disallowed to the extent indicated because it was not established that the *381 amounts in excess of those shown as allowed constituted ordinary and necessary expenses or were expended for the purpose designated. OPINION The first issue is whether petitioner is entitled to ordinary and necessary business expense deductions for amounts which he allegedly expended on behalf of SBPI in 1964. Section 162 allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Generally payments of the obligation of another party are not deductible as ordinary and necessary business expenses. . Also, a shareholder (even a majority or sole shareholder) is not entitled to a deduction from his personal income tax for payment of expenses of his corporation, such amounts constituting either a loan or a contribution to capital and are deductible, if at all, by the corporation. . An exception to the general rule, however, is made when expenditures are made by a taxpayer to protect or promote his own business, *382 even though the transaction giving rise to the expenditures originated with another person and would have been deductible by that person (or corporation) if payment has been made by him. See , and cases cited therein. Petitioner contends that he made the expenditures claimed on his 1964 income tax return on behalf of SBPI in order to protect his business reputation as an independent movie producer. Respondent contends that petitioner has failed to prove that he was in the trade or business of being an independent movie producer. The question of whether activities of an individual constitute carrying on a trade or business is dependent upon an examination of the facts in each particular case. ; (C.A. 3, 1958); and . The business of a corporation is considered to be separate and apart from the business of its officers and shareholders. , *383 and , affirmed per curiam (C.A. 6, 1973). Working as an executive for a salary, however, is considered to be a trade or business. (C.A. 2, 1961), and , affirmed (C.A. 2, 1963). Petitioner does not seek to attribute the business of SBPI to himself, rather he has attempted to demonstrate that he is in the trade or business of being an independent producer. After due consideration of all the evidence presented in this case, we find that petitioner was not in the trade or business of being an independent movie producer in 1964. The only proof offered that petitioner was in the trade or business of being an independent movie producer was the one limited partnership agreement for the Nazareth Company in which petitioner, as an individual, was a general partner and which was signed in December 1959. From that point in time, all limited partnership agreements for the production and exploitation of motion pictures were entered into by SBPI as general partner. Petitioner has *384 offered no proof that his activities with regard to the films produced under these arrangements or films produced later were other than as an employee of SBPI. See . Testimony at the trial indicated that the function of a producer, in this case, could be effectively separated into two stages. The first stage is the pre-filming period, during which the producer must establish the various departments (e.g., wardrobe) and the assembling of the various people necessary to make a motion picture. The second stage is, after filming has begun, to oversee the activity. The initial stages of the producing function were done by petitioner in his capacity as an employee of SBPI. Petitioner apparently contends, however, that he performed the "second stage" producing activities as an independent producer because he entered into separate contracts with each of the limited partnerships to produce the films. Petitioner's testimony on this point was, at best, unclear. He testified that he always signed employment contracts to produce each film, yet his testimony failed to indicate with whom such contracts were made. Petitioner first testified *385 that he was employed by each partnership to produce the film. He also testified, however, that he was employed "[either] by the partnership or Bronston Productions" and that his "main agreement" was always with SBPI. David Ffrench, an accountant employed by SBPI from 1963 through 1966, testified that SBPI, under the various limited partnership agreements, agreed to provide the services of petitioner for a producer's fee. Moreover, petitioner did not produce the agreements which he contends were entered into between himself and the various limited partnerships. Failure to produce evidence within his own control, which if true would be favorable to the petitioner, gives rise to the presumption that if produced it would be unfavorable. , affirmed (C.A. 10, 1947). In light of this presumption and the testimony of Ffrench we presume that all services of petitioner were provided through SBPI under his employment contract with that company. Furthermore, on his 1964 income tax return, petitioner reported *386 producer's fees as being paid from SBPI, buttressing the testimony of Ffrench that SBPI was providing petitioner's services to the various limited partnerships. Even if we accepted the contention that petitioner entered into separate agreements with each limited partnership, it would not prove that he was an independent producer. Each of the limited partnership agreements presented at the trial provided that petitioner could be employed to produce the specific motion picture in question. Thus, petitioner would merely have been an employee of each limited partnership. At the trial, petitioner testified at length about the difference between the major motion picture studios (e.g., MGM, Paramount) which had large permanent departments and staffs and an independent producer who must assemble the departments and staff for each movie. As is often true with closely-held corporations, petitioner may have confused the status of SBPI vis-a-vis other large motion picture producing corporations with his own status as an employee of a corporation in the trade or business of producing motion pictures. That, however, does not alter the legal status of petitioner when he has chosen to operate his *387 trade or business in the form of a corporation. Petitioner presented no evidence to indicate that he was an independent producer after the formation of SBPI.Furthermore, petitioner has produced no new films since 1964 or 1965. We find that petitioner was not in the trade or business of being an independent movie producer. Petitioner argues that even if found not to be in the trade or business of being an independent movie producer he is entitled to the deductions on his income tax return because of his personal guarantees to the Spanish creditors of the suspension payment proceedings. Accepting arguendo that an oral guarantee was made by petitioner to the Spanish Government, the evidence does not support petitioner's contention that he followed through on his guarantee. Stern testified that the money received on the oil deal was used to pay the personal creditors of petitioner and not the creditors of SBPI. DuPont also testified that petitioner did not settle with any of his Spanish creditors. Since petitioner has failed to prove that he had paid any creditors of SBPI under his guarantee, the fact that he entered into such a guarantee is not relevant. The second issue is *388 whether the amounts paid to petitioner by SBPI and ECDI should be characterized as payments of salary or as corporate distributions. Respondent determined that only $28,000 represented payments of salary, the balance being corporate distributions by SBPI and ECDI. The determination of the Commissioner has a presumption of correctness. Petitioner has presented no evidence on this question except his own self-serving testimony that he was underpaid for his services. He presented no proof as to the salaries paid to employees in similar positions in the motion picture field. Since petitioner has failed to meet his burden of proof, we held for the respondent on this issue. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise indicated. ↩
2. No evidence was presented nor testimony given at the trial to indicate who Moss represented as a trustee at the time the partnership agreements listed in the opinion were entered into. ↩
3. Unless specifically stated to be otherwise, discussion of the agreements refer to each of the five limited partnerships listed in the opinion. ↩
4. Discussions of agreement provisions in this paragraph refer to Bronston-Prado Productions, Bronston-Roma Productions, Bronston-Midway Productions and Bronston-Paris Productions. The limited partnership agreement for Bronston-France Productions presented at the trial lacked one page which, judging from the other limited partnership agreements, would have contained provisions covering the areas discussed in this paragraph. As a result of the missing page, however, we make no finding of fact or assumptions regarding the management of Bronston-France↩